IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:17cr389-MHT-SRW |
| | ) | |
| TIMOTHY CORTEZ ROBINSON | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant Timothy Cortez Robinson's motion to suppress (Doc. 8), and the government's response (Doc. 12). The court held an evidentiary hearing on the motion on December 19, 2017. For the reasons discussed below, the motion to suppress is due to be denied.

## FACTS

Defendant is charged with unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). *See* Doc. 1. The firearm and ammunition that give rise to this charge were seized from defendant on July 12, 2017, following a home visit by defendant's federal probation officer. *See* Doc. 8. It is this home visit – and specifically, a search of defendant's bedroom that occurred during the visit – that forms the basis of defendant's motion to suppress. *See id.*

On June 18, 2013, defendant pled guilty to unlawful possession of a firearm by a felon. *See* Gov. Ex. 1 at 1. On October 2, 2013, this court sentenced defendant to 37 months of imprisonment, followed by three years of supervised release. *See id.* at 2-3. One condition of defendant's supervised release was that he "not possess a firearm, ammunition, destructive device, or any other dangerous weapon." *See id.* at 3. Another was

that defendant "submit to a search of his person, residence, office and vehicle pursuant to the search policy of this court." *See id.* at 4. On December 28, 2015, United States Probation Officer Daniel Turner – who has been a federal probation officer since June 2015, and was responsible for supervising defendant from December 28, 2015 until defendant was arrested in July 2017 – met with defendant and instructed him concerning the terms and conditions of his supervised release. *See* Gov. Ex. 1 at 4. Defendant signed and dated the terms and conditions, acknowledging that these had been read to him and that he "fully underst[oo]d the conditions … ." *See id*. Turner also signed the document.

The events giving rise to the instant motion began in May 2017. According to Turner, defendant failed to appear for a drug test in May 2017, and again on June 8, 2017. Failure to appear for a drug test constitutes "noncompliant behavior" under the terms of defendant's supervised release, so Turner, accompanied by probation officer Kevin Poole, visited defendant at his home on June 9, 2017. The purpose of the visit was to "follow up on the reason why" defendant had missed his drug test. According to Turner, the visit was "pretty typical." Defendant's mother was home,[1] and there were some other family members there, including some young children whom defendant's mother was babysitting. Turner accompanied defendant to the bathroom to perform a drug test, while Poole went to defendant's bedroom. After completing the drug test, which returned a negative result, defendant "exited the bathroom and led the way to his bedroom where Poole already was." The officers and defendant then stood in the doorway to the bedroom, which was customary

---

[1] Defendant's mother, Ms. Hardy, testified that she was not at home on that date. The court need not resolve this factual discrepancy, as it has no meaningful impact on the analysis at hand.

during a home visit at that location. Turner counseled defendant that his failure to appear for a drug test constituted non-compliance, but because defendant had passed the at-home test, Turner decided that there was "no reason" to notify the court of defendant's noncompliance.

Approximately two minutes after the officers left the home, and while the officers were in the car, Poole told Turner that he had seen a "pearl-handled knife on the dresser, sort of on the other side behind the TV." According to Turner, Poole said that it was "[n]ot [hidden] behind the TV …, but [was situated] where it wouldn't be visible from entering the bedroom," and described the knife as "approximately [four] inches in the closed position." Turner testified that he believes Poole "just wanted [him] to have this information, for any future contacts … ." According to Turner, whether a knife was a "dangerous weapon" as contemplated by defendant's condition of supervision depended upon its presentation. Turner testified that although the knife was "described to [him] as a knife," he did not know whether the knife was being presented as a "weapon or a tool." Turner explained that if, for example, a knife was hidden in a pillowcase, he would think it was weapon, not a tool. Turner did not return to the home to investigate whether there was, in fact, a knife present. When asked whether he knew or had reason to suspect that defendant had been in violation of his supervision at the time Poole relayed his observations to Turner, Turner replied, "no."

The next month – on July 11, 2017 – defendant appeared for a drug test, which he

passed.[2] The following day, on July 12, 2017, Turner conducted a monthly home visit. Turner testified that this visit was "routine" and "not about the knife," but that he did "want[] to identify the knife." Turner testified that it is standard for him to conduct home visits with those whom he is supervising. During the period spanning from December 2015 to July 2017, Turner had visited defendant on numerous occasions. In the visits leading up to the encounter at issue in this case, defendant was always compliant with Turner's instructions, and defendant's instances of non-compliance related only to "substance abuse."

However, Turner testified that he was aware that defendant had a "violent criminal history," and that on "at least three occasions, one including the latest federal offense for which he was on supervised release[,] ... he had shot other individuals." Turner said that "during one of his sentences with the Department of Corrections, [defendant] was reprimanded or given some sort of noncompliance sanction for possessing – I believe the terminology was [–] a prison shank," which Turner said he understands to be "[a]nything that could be a sharp-edged weapon, pointed." According to Turner, the probation office conducts risk assessments on all convicted offenders. Turner testified that defendant's risk assessment "indicates that he needs a minimum of monthly contact[,] [s]o, that's the minimum standard ... in his case, [but], [w]e can go beyond that minimum standard." Thus, Turner visited defendant "at a minimum monthly."

During defendant's term of supervised release, it was routine for Turner to visit

---

[2] Turner did not know whether he or another officer conducted the drug test.

defendant at his home, which is a mobile home located at "5700 Bell Road, Lot 54, Montgomery, Alabama," and owned by his mother.[3] The only occasions on which the visits either occurred somewhere outside the home, or did not occur at all,[4] were when defendant was "in treatment" in Dothan or in custody in the Montgomery County Jail for "some old warrants that he was taking care of," and on one occasion when Turner met defendant in a Wal-Mart parking lot because it was a "middle ground from where [defendant] was traveling … ."[5] Turner estimates that he had somewhere between "eight to [twelve] home contacts" with defendant prior to the visit at issue. Typically, the home visit is a "very short contact." Turner testified that he "either drug screen[s] [defendant] in the bathroom and then go[es] to [defendant's] room, or … just go[es] to [defendant's] room." Turner usually has defendant walk in front of him while he is in the home for "officer safety," particularly when they enter defendant's bedroom. According to Turner, the visit is

> just about me laying eyes on his environment; what's typical. It's an unannounced contact, so he doesn't have time to straighten up, and I get to observe what his environment is like. So[,] it's typically very short. I just look around the room. I see if I notice anything out of the ordinary or that he shouldn't have. Typically, we just have a brief conversation, shake hands, and then I may walk through the living area or the kitchen area of the residence. But[,] typically[,] I'm just at the front of the house close to his bedroom, and it's brief. I usually leave right after that.

According to Turner, from the outset during the July 12, 2017 home visit,

---

[3] According to Turner, defendant lives with his mother. A younger brother is "often there," but has never been present during one of Turner's home visits. Defendant has his own room in the home.

[4] It is not clear from the testimony whether visits were conducted when defendant was in treatment and in custody.

[5] Turner testified that the contact can take place at home or "in the field," and that either "satisfies the requirement to meet with him outside the office at least once a month."

defendant's behavior was markedly different from all prior home visits. First, defendant "answered the door promptly, but … failed to open the door." Turner testified that although defendant is accustomed to his visiting, and knows that Turner is going to enter the home, this time defendant "only opened the door enough to put his head out[,] … did not open the door[,] … and waited until [Turner] … instructed him to open the door … ." According to Turner, the fact that he had to instruct defendant to open the door was a change from prior visits.

Turner testified that once defendant opened the door, he "turned around without any prompting and walked directly into the bathroom." Defendant "most likely just expected that [he] was going to ask [defendant] to perform a urinalysis," but because defendant had passed a drug test the previous day, Turner had no intention of testing him. After defendant walked into the bathroom, Turner advised him that there would be no test and they should just go into his room and talk, as they had done in all prior home visits. Turner then instructed defendant to go ahead and walk into his bedroom. During a typical home visit, Turner and defendant "just get in the doorway" and have a brief conversation, during which Turner observes the bedroom. But Turner testified that on this occasion defendant walked into his bedroom and immediately sat at the head of the bed – "in the area where the pillows would be" – "with his feet off the side of the bed." According to Turner, it was atypical for defendant to place so much distance between himself and Turner. It was also peculiar for defendant to take a seat. Turner said that, prior to the home visit giving rise to the instant indictment, defendant had never sat down, nor was he instructed to sit, during a home visit. Instead, Turner explained, after he and defendant "get in the doorway,"

> [Defendant] will linger to the right of the doorway, and I'll take a step or so to the left and face him. The doorway will be to my right by the time I turn and face him, and that allows me access to see 95 percent of the room. I can't see all the nooks and crannies, but I can see the majority of the room. But[,] typically[,] it's a brief enough contact that we're both just standing in the doorway.

According to Turner, he "never" lets defendant out of his sight during these visits.

Turner further testified that defendant's attire was unusual on that day; he was wearing shorts, with no shirt. Turner said that defendant is typically fully clothed during his home visits, except on one occasion when Turner arrived to find defendant shirtless. In that instance, defendant "asked [Turner] if he could put a shirt on before [they] went any further."

Once defendant sat on the bed, Turner walked into the bedroom, turned left, and proceeded toward the dresser underneath the television. Turner walked in this direction because Poole had indicated that he saw the pearl-handled knife on the dresser. Turner testified that he did not intend to search defendant at this point, but he was concerned about officer safety and "wanted to get a visual of where this knife was." According to Turner, the knife was described as "approximately four inches closed," which caused him to reason that it was likely "about double that" when opened. As noted above, Turner testified that a knife of that size could be construed as either a weapon or a tool, "depending on the presentation," and that as a condition of defendant's supervised release, he is not allowed to possess a knife as a weapon.

By the time Turner reached the dresser and saw that there was no knife in that location – approximately five to six seconds after defendant first sat down on the bed –

defendant was exhibiting more behavior that Turner found unusual. "[K]eeping his feet on the floor," defendant "reclined back along the head of the bed" – in other words, he lay horizontally on the bed – and then grabbed his cellular phone and brought up a Youtube video of an upcoming boxing match, which he said he had been watching. Turner testified that defendant then "showed [the video] to [him] as an indication of what he had been doing before [Turner] arrived." Turner said that this behavior contrasted with previous visits, during which the part of the visit taking place in the bedroom was never long enough for a discussion of "that type of thing." To Turner, the video "appeared to be a distraction"; Turner "felt that [defendant] was trying to conceal something on that part of the bed." Because the knife was not on the dresser, Turner testified, he "just assumed the knife was somewhere in the area that he was concealing, either in the blankets or under the mattress." According to Turner, the presentation of a knife in this manner – *i.e.*, "hidden" or "within his reach while he's sleeping" – indicates an intent to use it as a defensive weapon, and possession of such a weapon is a violation of the terms and conditions of defendant's supervision.

Ultimately, given Turner's awareness of defendant's violent criminal history, his knowledge of Poole's having reportedly seen a knife, his own determination that the knife was no longer in that location, and his observation of defendant's irregular behavior – *i.e.*, defendant's not opening the door fully when Turner arrived; not wearing a shirt and not asking to get dressed; not staying in the doorway to the bedroom as usual, and instead putting considerable distance between them in the bedroom; and taking a seat and then reclining horizontally on the bed and discussing a Youtube video (all of which he had never

done before and which appeared to Turner to be designed to conceal something and distract Turner from the concealed item's location) – Turner suspected that defendant was in possession of and attempting to conceal a dangerous weapon – *i.e.*, a knife – in violation of the terms of his supervised release.

Turner instructed defendant to get up, put his phone down, and stand in the doorway of the bedroom. With defendant positioned in the doorway, Turner realized that in order to walk around the bed to check the area where defendant had been lying, he would have to put his "gun side" close to defendant. This caused Turner concern for his own safety so, although he wanted to check the blanket and pillows in the area in which defendant had been reclining, Turner "made the decision that it would be better for [him] to lift that end of the mattress to check under the mattress before he had to walk past [defendant]." "[R]ather than passing [defendant] twice, [Turner] just decided to lift the mattress and then go check with the blankets and see if there was anything hidden … ." When Turner lifted the mattress, he "did so high enough so that [he] could see from the front of the bed all the way to the head of the bed." He observed a "metallic item," which he could not identify at that time, but which was "obvious[ly]" concealed. Given its metallic appearance, Turner assumed that the object was a weapon. At that point, Turner escorted defendant to his vehicle, where he retrieved handcuffs and restrained defendant. A firearm and ammunition were recovered from under the mattress and, according to defendant's motion to suppress, defendant thereafter admitted to possessing the firearm.[6]

---

[6] There was no testimony to this effect at the suppression hearing. The court does not know when this confession occurred, or the circumstances surrounding it.

The court also heard testimony from defendant's mother, Ms. Amelia Hardy. She said that in the time leading up to the arrest, the home had flooded and required renovations. Ms. Hardy testified that beginning in May 2017, and continuing into June 2017, she had used a box cutter, which "look[ed] kind of like a pocketknife," but "you would know … wasn't a knife," to "tak[e] up tile and stuff off the floor." She further testified that after doing this work, she closed the box cutter and placed it on the dresser by the television in defendant's room. When asked whether she "would have left it [on the dresser by the television] in "June of 2017," Ms. Hardy responded,

> Yes. It [had] been there for a while … Every time I would use it, I would put it in there – put it there. Because when I would go back in there – it wasn't like I was working in the room every day. So whatever day I would go in there, I would use it, and I would always put it back on the dresser so I [would] know where it [was] … .

Contrary to Turner's testimony, Ms. Hardy testified that she was not present in the home on June 9, 2017 – the date on which Poole purportedly saw a pearl-handled knife on the dresser. Ms. Hardy was also not present during the search on July 12, 2017.[7]

Prior to the date in question, Turner had never conducted a search during any of his home visits with defendant. According to Turner, the "search policy of this court" is "the same as the federal guide," "which our district has adopted as policy." When asked for specifics about the policy, Turner said, "Essentially … we do have the ability to search. It's a tool at our discretion. And … we should reserve searches for when we have reasonable suspicion to believe that something is or could take place – a crime could be in

---

[7] Ms. Hardy arrived at the home after the search, but before local law enforcement arrested defendant.

10

the process of being committed or could be committed." Turner indicated that a search is also appropriate when there is reasonable suspicion "that the defendant is in violation of any terms" of supervised release, which he explained "could be technical offenses[,] rather than criminal offense[s]." For example, Turner said, "if a defendant had a financial term where [he or she] [wasn't] allowed to open new credit without first getting the Court or the probation officer's approval, opening new credit wouldn't necessarily constitute a criminal charge, but it would be a technical violation of [his or her] commitment or … judgment," and in such an instance, a probation officer would be able to search the defendant's person or residence for indications, signs, or proof of violations of that term.

## DISCUSSION

### Introduction

In his motion to suppress, defendant contends that Turner lacked the reasonable suspicion required to conduct the search that resulted in the discovery of defendant's firearm. Defendant argues that the officers "had no evidence" that defendant "had violated any conditions of his supervised release or was otherwise engaged in criminal conduct." *See* Doc. 8 at 5. Defendant asks the court to suppress the firearm, as well as defendant's admission that he possessed the firearm. *See* Doc. 8 at 7.

In its response, the government argues that reasonable suspicion is not a necessary prerequisite for a search of a defendant on supervised release, if that release is subject to a search condition. *See* Doc. 12 at 3.  In the alternative, the government contends that Turner had reasonable suspicion to perform the search. However, at the evidentiary hearing, the government conceded that a probation officer must possess reasonable suspicion prior to

initiating a search of a defendant on supervised release.[8] As explained in more detail below, the court agrees. Therefore, the question at hand, as presented by the parties, is whether the reasonable suspicion standard has been met.

**The Search**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. "The Fourth Amendment's protection against unreasonable searches and seizures unquestionably applies to probationers." *United States v. Wasser*, 586 F. App'x. 501, 504 (11th Cir. 2014) (unpublished)(citing *Owens v. Kelley*, 681 F.2d 1362, 1367 (11th Cir. 1982)). "Probationers, however, have a diminished expectation of privacy and 'are subject to limitations to which ordinary citizens are free.'" *Id.* (quoting *Owens* at 1367-68).

In *United States v. Riley*, 706 F. App'x 956 (11th Cir. 2017) (unpublished), the Eleventh Circuit recently addressed the standard to be applied in assessing whether a warrantless search of a probationer's home violates the Fourth Amendment. The court explained:

> In *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Supreme Court held that the warrantless search of a

---

[8] During oral argument, defense counsel stated, "[I] think the government's position has slightly changed since its response. It appeared that their response was [that] this [i]s a sort of … search that should be based on consent, and I don't think that was the policy here. There has to be reasonable suspicion … ." During rebuttal argument, counsel for the government stated, "Judge, I will concede this: Based on what the officer said, the government's position has slightly changed … ." Counsel proceeded to explain why there was reasonable suspicion for the search and concluded by stating, "So, the government's position is that in this case, pursuant to the terms and conditions of search for this district, Turner had reasonable suspicion … to conduct the search that day in that instan[ce]."

probationer's home by a law enforcement officer for investigatory purposes was permissible, even though it was supported by only a reasonable suspicion, rather than probable cause, that criminal conduct was occurring. 534 U.S. at 121–22, 122 S.Ct. 587. The probationer was subject to a condition requiring him to submit to searches of his residence by any probation officer or law enforcement officer at any time, with or without a search warrant, warrant of arrest, or reasonable cause. 534 U.S. at 114, 122 S.Ct. 587. A sheriff's detective decided to search the probationer's apartment after observing suspicious objects in the probationer's trunk, and, aware of the probationer's search condition, did not apply for a warrant. *Id.* at 115, 122 S.Ct. 587.

The Court stated that "the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118–19, 122 S.Ct. 587 (quotation omitted). Balancing these competing considerations, the Supreme Court noted that a probationer does not enjoy the same amount of liberty as other citizens. *Id.* at 119, 122 S.Ct. 587. It further noted that probationers are more likely to commit crimes than other citizens, and the government therefore has an interest in keeping close watch over them. *Id.* at 120, 122 S.Ct. 587. Furthermore, probationers have a greater incentive to conceal the evidence of their crimes, because they are subject to greater scrutiny than the average citizen. *Id.* The Supreme Court determined that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of th[e] probationer's house." *Id.* at 121, 122 S.Ct. 587.

In *United States v. Yuknavich*, 419 F.3d 1302 (11th Cir. 2005), we followed *Knights* and concluded that reasonable suspicion was all that was required to search a probationer's computer, even where the probation agreement limited his internet use to work related purposes during work hours but did not require him to submit to warrantless searches. *Yuknavich*, 419 F.3d at 1309–11. We reasoned that the conditions on the probationer's computer use reduced his expectation of privacy in his computer; thus, the search of the computer was permissible based only on reasonable suspicion. *Id.* at 1310–11.

In *United States v. Carter*, 566 F.3d 970 (11th Cir. 2009), we followed the reasoning in *Yuknavich* and again found that a warrantless search of a probationer's home by probation officers and based on reasonable suspicion was constitutionally permissible, even in the absence of a condition of probation permitting such a search. *Carter*, 566 F.3d at 973–75. We applied the balancing test articulated in *Knights* and concluded that reasonable

suspicion was the correct standard for analyzing the reasonableness of the search at issue in that case. *Id.* at 974. Examining the probationer's privacy interests, we noted that Carter did not enjoy the absolute liberty to which every citizen is entitled. *Id.* In addition, he was required to submit to visits by the probation officer at his home, workplace, or elsewhere, and the government had a competing interest in preventing him from committing further crimes. *Id.*

We held that, although the probationer possessed a higher expectation of privacy than the defendants in *Knights* and *Yuknavich* because he lacked an express search condition or a condition limiting his computer use, a condition of probation requiring him to submit to home visits by his probation officer nevertheless reduced his expectation of privacy. *Id.* at 975. We concluded that when "a probationer has a condition of probation reducing his expectation of privacy, and the government has a higher interest in monitoring the probationer due to the nature of his criminal history, a search can be permissible when supported only by reasonable suspicion." *Id.* The probation officers had reasonable suspicion to search Carter's home due to evidence of a pattern of conduct over a two-year period that indicated Carter was engaged in criminal activity, including just two weeks before the search occurred. *Id.*

Based on *Carter*, probation officers are required to have reasonable suspicion of criminal conduct in order to search a probationer's residence when the terms of probation do not require him to submit to warrantless searches. *See id.* at 974–75.

*Id.* at 959-960.

While *Knights* and its Eleventh Circuit progeny concerned probationers, their reasoning is also applicable to cases involving supervised releasees, who have an even more diminished expectation of privacy. *See United States v. Makeeff*, 820 F.3d 995 (8th Cir. 2016)("Supervised release, parole, and probation lie on a continuum. The most severe is supervised release, which is followed, in descending order, by parole, then probation. Thus … the current case involves the most circumscribed expectation of privacy.") (internal quotation marks and citations omitted). Following this logic, numerous courts

have applied *Knights*' reasonable suspicion analysis to the search of a supervised releasee's residence. *See, e.g., United States v. Lofton*, 244 F. App'x. 113, *1 (9th Cir. 2007)(applying *Knights* to the search of a supervised releasee's residence); *United States v. Berger*, 2014 WL 180483, *7 (W.D. Ark. 2014)(adopting recommendation holding that, like a probationer, "[a]n individual serving a term of supervised release has a diminished expectation of privacy and the Government has the same concerns regarding recidivism.")(citing *Samson v. California*, 547 U.S. 843, 850, 854-55 (2006)(finding that parolees have fewer expectations of privacy that probationers and the State's concerns in protecting the public from criminal acts by reoffenders are even greater, because parole is more akin to imprisonment on the continuum of punishments; citing *United States v. Reyes*, 283 F.3d 446, 461 (2nd Cir. 2002), which held that the same principles apply to federal supervised release, because federal supervised release, in contrast to probation, is meted out in addition to, not in lieu of, incarceration; and *United States v. Weikert*, 504 F.3d 1, 12-14 (1st Cir. 2007)); *United States v. Krug*, 2010 WL 2196607, *4-5 (M.D. Tenn. 2010)(applying *Knights* to search of supervised releasee's residence); *U.S. v. Lykins*, 2012 WL 1947346, *8 (E.D. Ky. 2012)(same).[9]

---

[9] "Moreover, [several] circuits have recognized that supervised releases and probationers have similar expectations of privacy." *Lykins* at *8. (citing *United States v. Stewart*, 532 F.3d 32, 36 (1st Cir. 2008)(recognizing that probation and supervised release are different forms of conditional release, and courts have not distinguished among conditional releasees for Fourth Amendment purposes); *Weikert*, 504 F.3d at 12 (refusing to distinguish between the privacy interests of a supervised release versus those of a probationer); *United States v. Zimmerman*, 514 F.3d 851, 855 (9th Cir. 2007)(treating probationer's Fourth Amendment challenge to DNA Act as foreclosed by prior precedent addressing challenge by supervised release); *Banks v. United States*, 490 F.3d 1178, 1187 (10th Cir. 2007)(supervised releasees and probationers fall into the "category of felons on release who are not entitled to the full panoply of rights and protections possessed by the general republic"). "In fact, the Second Circuit has held that supervised release places the most severe

Turning to the case at hand, it is clear, just as in the *Carter* case, that as a supervised releasee defendant does not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty dependent upon his observing special release conditions. *See Yuknavich*, 419 F.3d 1302, 1308 (11th Cir. 2005). In addition, defendant here agreed to a search condition requiring him to "submit to a search of his person, residence, office and vehicle pursuant to the search policy of this court." Gov. Ex. 1 at 4; *see Knights*, 534 U.S. at 118 (consent is salient factor in assessing defendant's reasonable expectation of privacy under the totality of the circumstances test). Thus, the court concludes that defendant had a significantly reduced expectation of privacy in his home at the time of the search. In addition, the same legitimate governmental interests support the search in this case as in *Knights*, *Carter*, *Yuknavich*, *Riley*, and similar cases. Further, as in *Carter*, defendant has a history of committing violent crimes,[10] which makes the government's interest in monitoring his supervised release particularly high. *See Carter*, 566 F.3d at 974-975.[11] Thus, Turner required no more than reasonable suspicion to conduct a search of defendant's house. *See Yuknavich*, 419 F.3d 1309-1310.

---

limits on expectations of privacy, greater than those of both parole and probation." *Id.* (citing *United States v. Balon*, 384 F.3d 38, 44 (2nd Cir. 2004)).

[10] *See supra*, p. 4, outlining Turner's testimony that he was aware of defendant's "violent criminal history," and prior possession of "a prison shank."

[11] In *Carter*, the court explained that the government has a heightened interest in monitoring a probationer when the probationer has a history of violent *felonies*, and for this principle cited the sentencing guidelines, which provide enhanced penalties for criminals with a history of violent felonies. In this case, the court has no evidence before it establishing that the violent crimes to which Turner referred were, in fact, felonies; however, to the extent they were crimes which including the shooting of another person, the same rationale applies here.

The court now turns to the question of whether reasonable suspicion existed in this case. "[A] court must look to the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'[12] … To determine whether officers had reasonable suspicion, [the court] 'must take stock of everything they knew before searching.'" *United States v. Gomes*, 279 F. App'x. 861, 870 (11th Cir. 2008)(citations omitted)(unpublished). "The Eleventh Circuit has stated that '[w]hether an officer has reasonable suspicion is an objective question viewed from the standpoint of a reasonable officer at the scene.' … The determination is based upon an examination of the 'totality of the circumstances,' but the subjective motives of the officer are immaterial. …' *Madaio v. Franklin*, 2014 WL 130462, 4-5 (N.D. Ala. 2014)(citations omitted)(unpublished). An officer's knowledge of a probationer's past criminal convictions and violations is a relevant factor in determining whether he had reasonable suspicion to search the probationer's person or his property. *See id.* at *4 and n.10, *see also Yuknavich*, 419 F.3d at 1310.

In the case before the court, taking "stock of everything [Turner] knew before searching," it would be reasonable for an officer in his position at the scene to suspect legal wrongdoing – *i.e.*, either a supervised release violation or an otherwise criminal act.

---

[12] In the context of a search of a supervised releasee's residence, the suspected "legal wrongdoing" for which there must be reasonable suspicion either may be a violation of the terms and conditions of release or some other criminal activity. *See, e.g., United States v. Hamilton*, 591 F.3d 1017 (8th Cir. 2010)(proceeding on the premise that parole officers were entitled to search the defendant's home without a warrant only upon a finding of reasonable suspicion of a parole violation or a crime); *United States v. Korey*, 2015 WL 737638 (W.D. Penn. Feb. 20, 2015)(applying *Knights* and analyzing whether an officer had reasonable suspicion that evidence of a violation of a condition of supervision would be found in the defendant's residence).

Specifically, it would have been reasonable for an officer in Turner's position to have suspected that defendant was in possession of and attempting to conceal a knife.

First, Turner was personally acquainted with and had supervised defendant for almost a year and a half when the search occurred. He was aware that defendant had a violent criminal history. Turner knew that defendant had shot persons on at least three occasions, and that one of these was the latest federal offense for which he was serving supervised release. He also knew that defendant had been reprimanded or sanctioned while in prison for possessing a shank.

Second, Turner knew, when he entered defendant's bedroom, that Poole had personally seen a pearl-handled knife in defendant's bedroom, and that such a knife – depending on its character and presentation in the room – could be the sort of "dangerous weapon" that defendant's release conditions prohibited him from possessing. He also knew by the time he entered the bedroom that the knife was no longer where Poole had observed it. Although defense counsel argued at the hearing that what Poole actually saw was "a utility tool," implying that Poole mistook Ms. Hardy's box cutter for a knife, the court cannot draw this conclusion based on the testimony before it. Even if Ms. Hardy's testimony is taken as true, it does not render Poole's reported observations implausible. First, while Ms. Hardy testified that she would have left the box cutter on the dresser by the television during June 2017, she did not testify affirmatively that the box cutter was actually present during the June 9, 2017 home visit. Further, even assuming that the box cutter was on the dresser during this home visit, Ms. Hardy testified that no person could have mistaken the box cutter for a knife. Therefore, it is reasonable to believe that what

Poole saw was, in fact, a knife, even if the box cutter were also present. Poole reported specific details about the knife to Turner – *i.e.*, that the knife was approximately four inches long in the closed position and pearl-handled. Although the court does not have the benefit of testimony from Poole, it reasonably infers, based on the evidence before it, that if Poole were in a position to communicate such details about the item to Turner, he also was close enough to determine whether it was a box cutter or a knife. Thus, even accepting Ms. Hardy's testimony as credible, the court cannot conclude that because Ms. Hardy was storing a box cutter on the dresser in June 2017, what Poole saw on the dresser was the box cutter, especially given his reported description of at least one attribute that would be inconsistent– with a box cutter used to perform home renovations– *i.e.*, that it had a pearl handle. [13]

But for his argument that what Poole observed was a box cutter, Defendant cites no other basis to call into question the factual basis of Poole's statement to Turner, or the reasonableness of Turner's reliance on that statement. The court must consider all facts known to Turner prior to his initiating the search in determining whether or not a reasonable officer in his position would have suspected wrongdoing. The court finds that Turner's knowledge – *via* Poole – of the prior existence of a knife in the room, is appropriately considered as one of these facts.

Returning to the other facts that Turner knew before he initiated the search, Turner's past experience with defendant also informed his understanding of how defendant normally

---

[13] Indeed, the court believes it would be hard-pressed to find a pearl-handled box cutter.

acted during a home visit. Because he had conducted as many as twelve home visits over nearly eighteen months by the time this encounter took place, Turner was well-enough acquainted with defendant to perceive irregularities and draw inferences based on them. The following behavior observed by Turner prior to his search is significant to the reasonable suspicion determination, when taken altogether:

First, the defendant did not open the door all the way when Turner arrived, thus necessitating Turner's having to ask to be let in. This was out of the norm for defendant and, taken together with the other facts Turner later observed, could reasonably contribute to a conclusion that defendant was nervous or apprehensive about letting Turner into the home because he had a weapon in his bedroom, and knew that Turner would view that room.

Second, the defendant was not wearing a shirt and did not ask to get dressed before proceeding with the visit. Like defendant's behavior with the door, this factor is insufficient, standing alone, to create a reasonable suspicion that defendant was engaged in wrongdoing. However, the behavior was atypical, and it contrasted with how defendant had handled a similar situation during another home visit. Given Turner's experience with defendant, it was not unreasonable for him to consider this anomaly along with the others in suspecting that defendant was hiding a weapon. Moreover, although the government has not explicitly made this argument, Turner would not have been unreasonable in suspecting that defendant did not want to put a shirt on because Turner would have followed defendant – to the bedroom, presumably – and would have had more time to observe the bedroom closely and possibly discover the violation.

Third, defendant did not remain in the doorway to the bedroom during the conversation, which was his normal practice during prior home visits. According to Turner, during a typical home visit, Turner and defendant "just get in the doorway" and have a brief conversation, during which Turner observes the bedroom. But Turner testified that on this occasion, defendant walked into his bedroom and immediately sat at the head of the bed – "in the area where the pillows would be" – "with his feet off the side of the bed." It was atypical for defendant to place so much distance between himself and the probation officer, and it was reasonable for Turner to include this among the factors that made him suspicious that defendant was attempting to conceal something that was prohibited.

In addition, defendant "reclined back along the head of the bed" – in other words, he lay horizontally on the bed – and, while "keeping his feet on the floor," grabbed his cellular phone, and brought up a Youtube video of an upcoming boxing match, which he said he had been watching. Turner testified that defendant then "showed [the video] to [him] as an indication of what he had been doing before [Turner] arrived." According to Turner, this contrasted with previous visits during which defendant never sat nor was invited to sit, and in which the portion of the visit that took place in the bedroom had never been long enough for a discussion of something like a cell phone video. To Turner, the discussion of the video "appeared to be a distraction." Turner believed that defendant's lying on the bed and chatting was an attempt to conceal something on that part of the bed. "Because the knife wasn't on the dresser," Turner testified, he "just assumed the knife was somewhere in the area that he was concealing, either in the blankets or under the mattress." Combined with the other facts known to Turner, this deduction was reasonable.

In summary, Turner approached the home visit knowing that defendant had a violent criminal history. He had reason to believe that defendant had a knife in his room, and once he got in the room, the knife was nowhere to be seen. Moreover, defendant exhibited behaviors that, taken together, suggested he was hiding something. Viewed in the totality of the circumstances, and taking into account all that Turner knew prior to initiating the search of defendant's bedroom, it would have been reasonable for an officer with knowledge of these facts to suspect that defendant was attempting to conceal something on or under the bed and also, that he was attempting to distract Turner from looking in that direction. It also would have been reasonable for an officer in Turner's position to suspect that the item being concealed was the pearl-handled knife about which he had been warned by Poole.[14]

"Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and less than probable cause, which is a fair probability that contraband or evidence of a crime will be found." *United States v. Henderson*, 145 F. App'x. 346, 351 (11th Cir. 2005) (citation and internal quotation marks omitted)(unpublished).

> [I]t is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases – especially those involving drugs or illegal weapons – the probation agency must be able to act based upon a lesser degree of certainty that the Fourth

---

[14] To the extent that defendant intended to suggest that Turner had an ulterior motive and planned to search the bedroom regardless of whether he gathered facts which would rise to reasonable suspicion, that argument fails. The subjective motivations of the searching officer are irrelevant to the inquiry. *See Madaio*, 2014 WL 130462 at 4-5.

> Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.

*Id*. (citing *Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987)). The same is true in the context of supervised release.

Thus, the court concludes that Turner possessed the necessary reasonable suspicion to search defendant's bedroom, which resulted in his finding a metallic object under the mattress that was later determined to be a handgun, along with ammunition, both of which defendant was prohibited from possessing. Under the totality of the circumstances, the court finds no Fourth Amendment violation here.

**The Confession**

Because there was no Fourth Amendment violation, the question of whether the confession was the "direct result" of a violation and should be suppressed is moot.

## CONCLUSION

Defendant has failed to establish that Turner lacked reasonable suspicion to conduct the search in question. Accordingly, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress the firearm and confession (Doc. 8) be DENIED.  It is further

ORDERED that **on or before February 8, 2018**, the parties may file an objection to the Recommendation.  Any objection filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party filing the objection

objects.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file a written objection to the Magistrate Judge's findings and recommendations under 28 U.S.C. §636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done, on this the 25th day of January, 2018.

/s/ Susan Russ Walker_____
Susan Russ Walker
U. S. Magistrate Judge